# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 10-22206-Civ-GRAHAM/TORRES

BR-111 IMPORTS & EXPORTS, INC.,

      Plaintiff/Counter-Defendant,

vs.

INDUSPARQUET INDUSTRIA E
COMERCIO DE MADEIRAS LTDA., et. al.,

      Defendants/Counter-Plaintiffs,

and

BRW FLOORS, INC., et. al.,

      Third-Party Plaintiffs,

vs.

RMDP, LLC, a Florida Limited Liability
Company, et. al.,

      Third-Party Defendants.
_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on the dueling preliminary injunction motions filed by Plaintiff BR-111 Imports & Exports and Counter-Plaintiff BRW Floors, Inc. [D.E. 5, 21], together with a motion for prejudgment writ of replevin filed by Counter-Plaintiff BRW [D.E. 10].   The Court granted the parties' requests for expedited emergency hearing on the motions, which hearing commenced on July 29th and concluded on August 3rd, 2010.   Thereafter, on September 3rd, 2010, BRW filed its

Verified Emergency Motion for Temporary Restraining Order related to its replevin motion [D.E. 58].  The Court has considered the testimony and exhibits admitted in evidence taken at the hearing, together with the parties' memoranda supporting their motions and the record as a whole.  For the following reasons, the parties' motions should be Denied.

## I.  BACKGROUND

Plaintiff/Counter-Defendant BR111 was, for approximately 20 years, an importer and distributor of products – principally Brazilian hardwood flooring – from a Brazilian supplier, Indusparquet Industria e Comercio de Madeiras Ltda. ("Indusparquet").  Defendant/Counter-Plaintiff BRW Floors, Inc. ("BRW") is an affiliate of that supplier, recently incorporated in Florida, that also markets and distributes those floor products in the United States market.  During the times relevant to this action, BRW maintained its physical facilities at the same location and storage facility as BR-111.

Mr. Moraes and Mr. Pagano are shareholders and officers in BR-111, as well as Third-Party Defendant RMDP – the entity that owns the physical location where BR-111 and BRW operated.  Up until the last few years, the principal parties – BR111 as distributor and Indusparquet as supplier – had an oral and custom/practice agreement for the distribution of Indusparquet products in the United States.  BR-111 distributed those products using its registered trademarks through a chain of distributors who, in turn, sold the products to other distributors, dealers, retailers and also end-consumers.

Under the ordinary course of this arrangement, the products were manufactured and packed by Indusparquet in Brazil for distribution by BR-111, with the BR-111 trademarks utilized for the packaging.  The products, boxes and packaging were owned by Indusparquet until such time as they were sold and ultimately delivered to BR-111. BR-111 would make payment to Indusparquet either at the time of delivery or thereafter.

Up until 2007, this business relationship was successful for all parties.  BR-111 developed an industry-wide reputation and generated positive goodwill in the marketplace.  Indusparquet products were commercially successful.  BR-111 developed various marketing ideas to promote its products, primarily through dealer displays and promotions.

By 2007, however, the market for exotic hardwood flooring collapsed along with the rest of the economy tied to development of real estate.  Without a market for new housing or upgrades to new housing, the market for high-end Brazilian flooring decreased.  The business relationship generated by the parties here soured.  During the years 2007 through 2009, BR-111 continued to make purchases from Indusparquet but failed to make timely payment.  By July 2009, BR-111 carried a debt of over $5.2 million to Indusparquet for products delivered.  There is no dispute in this record that the full amount of this pre-existing debt has not been satisfied, though there is dispute as to the extent of the remaining debt owed.

On July 1, 2009, Indusparquet created BRW Floors in response to the problems generated by BR-111's rising debt.  BR-111 had sought to renegotiate the payments on the first BR-111 debt and sought to reach agreement for continuing sales of the product

from BRW Floors.  The parties agreed that BRW Floors would sell to BR-111 on credit to allow it to continue operating and marketing the products.  BRW Floors would be located within the existing facilities at BR-111 in Miami, Florida so that BRW could monitor the sales of Indusparquet products by BR-111, as well as to facilitate its own distribution of Indusparquet products stored at the facility.

By February 2010, however, BR-111 fell behind on its payments to BRW under the parties' second arrangement.  This second debt, as referred to at the evidentiary hearing, reached about $2.2 million by that point in time.  The parties do not dispute that this amount was owed at that time for products sold to BR-111, but dispute the amount of that debt to date, based upon payments made by BR-111, accounts receivable that BR-111 seeks to credit against its account – principally from its largest customer Loew's – as well as credits for the expenses to be charged against BRW for the use of the facilities.  BRW claims that the debt that remains outstanding is at least $1.6 million on this second debt.  BR-111 maintains that this second debt, through all the credits and charges cited at the hearing, has now been satisfied.  The Court finds, however, and based on the very limited record presented at the hearing, that there remains at least some material portion of this second debt that has not been fully satisfied.

The parties also dispute whether, by this early 2010 time period, BR-111 was honoring its contractual obligation to pay off its debt in a good faith manner.  BRW claims that by this point the principals of BR-111 were forming another entity for the purpose of selling product outside of its debt restructuring arrangement with BRW and Indusparquet.  BRW points to an entity called Epic formed in April 2010 for the

distribution of exotic wood floors, which BRW claims was then used by BR-111 to funnel sales payments owed to BRW and converted for Epic.

BR-111 disputes the extent to which its principals were operating a functioning entity that competed with BRW. They do not dispute, however, that by May 2010 they wanted to shift the focus of their marketing efforts from distributor arrangements to more direct consumer sales through the internet. The purpose of this new arrangement was intended to be lower distribution and marketing costs that would allow for lower retail cost for consumers who would no longer pay for product at pre-2008 levels. BRW and Indusparquet, however, were not interested in pursuing this new business model and wished to continue to support the distribution market already in existence. BRW was in fact contacted by distributors to purchase Indusparquet products directly.

Once the parties reached this point, BRW and Indusparquet decided to sever their ties to BR-111 and move to another physical location to continue marketing and distributing Indusparquet products, now utilizing the Indusparquet trademarks. A problem at issue in this litigation, however, remains. BRW wishes to tape over BR-111's own trademarks, used on the packaging of the products, which by itself would not be too difficult an issue. BRW also wishes to use dealer displays, manufactured, engineered and developed by BR-111 for sale to its distributors, currently located in distributor and retail outlets for the sale of Indusparquet products under the BRW label. BR-111 argues, however, that it owns trademark and design patent rights to those displays, which precludes BRW from merely converting those same displays for its own purposes in violation of federal law.

BRW points out, however, that those displays are no longer owned by BR-111; rather, they are owned by the distributor outlet that purchased them from BR-111. Consequently, to the extent that distributor wishes to participate in BRW/Indusparquet product sales, the distributor has every right to use its displays for these products so long as any mention of BR-111 trademarks are also covered over or replaced. BRW also contends that, even if that was not a viable defense to a trademark or design patent claim, based upon BR-111's debt restructuring agreements and the amounts that remain outstanding BR-111 is no longer in control of those trademarks as they have been licensed to BRW and Indusparquet as a condition of the restructuring agreements. Hence, BR-111 has no standing to object to BRW's marketing efforts on the basis of those trademark rights.

The other pending dispute centers on products delivered and now located at the BR-111 premises. BRW argues that it is entitled to immediate possession of that product because it was at all times intended to be under the exclusive ownership and possession of BRW upon its delivery from Brazil. The inventory, which is valued at over $4 million, was shipped to BRW under bills of lading that clearly identified BRW as purchaser. BR-111 employees, however, assisted in the unloading of the product at the BR-111 warehouse, and the product was indisputably stored at the BR-111 facilities. Nevertheless, BRW maintains that it is entitled to exclusive and immediate possession of that inventory for sale to its distributors, and that BR-111 is wrongfully withholding the BRW inventory as leverage in its contractual dispute with BRW.

BR-111 disputes BRW's replevin claim over this inventory. BR-111 argues that the product belongs to BR-111, because that is where it was delivered under a custom

and practice arrangement that resulted in BR-111 taking possession and ownership of the products upon delivery.  BR-111 relies on the Uniform Commercial Code nd the parties' custom and practice.  The products were manufactured by Indusparquet under BR-111 specifications and shipped to BR-111.  They were packaged with BR-111 warranties and trademarks.   Thus, as was the course of performance between the parties for some time, BR-111 takes possession of the product for distribution and is indebted to Indusparquet for the products.  And BR-111 adds that this product is part of the amounts that give rise to the debts in dispute in the litigation.   BR-111 analogizes these facts to a consignment sale under the U.C.C., where title passes to the buyer at the time and place of performance upon physical delivery of the goods.  Here, BR-111 allegedly accepted the goods upon their delivery to its location, thus title passed to the buyer – BR-111 – at that time despite any reservation of a security interest or documentary evidence of title.

## II.   ANALYSIS

### A.   Cross-Motions for Preliminary Injunction

#### 1.   Legal Standard

To obtain a preliminary injunction, a plaintiff must demonstrate the following: "(1) a substantial likelihood of success on the merits of the underlying case; (2) the movant will suffer irreparable harm in the absence of an injunction; (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve the public interest." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299

F.3d 1242, 1246-47 (11th Cir. 2002); *see also Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to the four requisites." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) ("[b]ecause a preliminary injunction is 'an extraordinary and drastic remedy,' its grant is the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion."). However, "[i]f the movant is unable to establish a likelihood of success on the merits, a court need not consider the remaining conditions prerequisite to injunctive relief." *1-800 Contacts*, 299 F.3d at 1247 (citing *Pittman v. Cole*, 267 F.3d 1269, 1292 (11th Cir. 2001)).

The goal of a preliminary injunction is to prevent irreparable harm and to "preserve the district court's power to render a meaningful decision after a trial on the merits." *Canal Auth. of the State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). "[T]he most compelling reason in favor of [granting a preliminary injunction] is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act." *Id.* at 573; *see also All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989) ("Preliminary injunctions are issued when drastic relief is necessary to preserve the *status quo*.").

When an injunction does more than preserve the *status quo*, however, an even stronger showing is required. *See, e.g., Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958) ("A mandatory injunction . . . especially

at the preliminary stage of proceedings, should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party."); *United States v. Board of Educ. of Green Cnty., Miss.*, 332 F.2d 40, 46 (5th Cir. 1965) ("mandatory injunctions are rarely issued and interlocutory mandatory injunctions are even more rarely issued, and neither except upon the clearest equitable grounds").

A temporary restraining order is an appropriate remedy in a situation where a party is facing immediate irreparable harm which will likely occur before a hearing for preliminary injunction can be held.  Fed. R. Civ. P. 65; 11A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2951 (2d ed. 1995).

### 2. *BR-111's Motion for Preliminary Injunction*

BR-111's complaint asserts six causes of action against Defendants: 1) trade dress infringement in violation of Lanham Trademark Act § 43(a), 15 U.S.C. § 1125; 2) patent infringement in violation of 35 U.S.C. § 271; 3) breach of contract; 4) breach of implied covenant of good faith and fair dealing; 5) tortious interference with advantageous business relationship; and 6) violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201-501.213.

In its motion for temporary restraining order and preliminary injunction, BR-111 seeks the Court to enjoin Defendants from infringing on BR-111's patent and its trade dress.  The motion also seeks to enjoin Defendants from violating the FDUTPA by restraining them from: 1) using BR-111's product codes; 2) attempting to ship product to distributors in BR111's boxes by putting a sticker over BR-111's goods; 3) contacting distributors and dealers to inform them that Indusparquet is taking over

for BR-111 and that Indusparquet actually is BR-111; 4) interfering with BR-111's relationship with Lowes' stores; and 5) suggesting to dealers that they simply place the Indusparquet label on BR-111's displays.   BR-111 contends that there exists a substantial likelihood that it will prevail at trial on its trade dress infringement, patent infringement, and the FDUTPA claims.   BR-111 also argues that an injunction is warranted in order to preserve *status quo* of the parties and to prevent irreparable injury to BR-111.   Finally, BR-111 contends that enjoining Defendants from their actions would be far outweighed by the immediate and long-term irreversible harm to BR-111.

To prevail on a trade dress infringement claim under section 43(a), a plaintiff in the Eleventh Circuit must prove three elements: 1) its trade dress is inherently distinctive or has acquired secondary meaning; 2) its trade dress is primarily nonfunctional; and 3) the defendant's trade dress is confusingly similar.  *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1535 (11th Cir. 1986).  "[A]ll three elements are necessary for a finding of trade dress infringement, any one could be characterized as threshold." *Epic Metals Corp. v. Souliere*, 99 F.3d 1034, 1039 (11th Cir. 1996).  However, "[t]he touchstone test for a violation of § 43(a) is the likelihood of confusion resulting from the defendant's adoption of a trade dress similar to the plaintiff's."  *Vital Pharm., Inc. v. Am. Body Bldg. Prods., LLC*, 511 F. Supp. 2d 1303, 1314 (S.D. Fla. 2007) (internal quotation omitted).

First, we conclude that BR-111 has failed to establish that the display racks and boxes are nonfunctional and thus protectable trade dresses.  The Eleventh Circuit has laid out two tests for determining functionality:

> Under the first test, commonly referred to as the traditional test, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost of quality of the article.  Under the second test, which is commonly called the competitive necessity test and generally applied in cases of aesthetic functionality, a functional feature is one the exclusive use of which would put competitors at a significant non-reputation-related disadvantage.  Where the design is functional under the traditional test, there is no need to proceed further to consider if there is a competitive necessity for the feature.

*Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC*, 369 F.3d 1197, 1203 (11th Cir. 2004).  The boxes and display racks fail the traditional test.  BR-111 has not established how the boxes and the display racks are unique and their design identifies BR-111 as their sources.  The evidence proffered by Defendants suggests that various companies in the flooring industry utilize similar display racks to showcase their products.  BR-111 also fails the competitive necessity test.  Mainly, it cannot claim that it has an "exclusive"right to sell wood floors in its rectangular boxes and to market its products and ensure their visibility by placing samples on floor standing display racks in stores.

Most of all, however, Plaintiff has failed to establish the potential risk of consumer confusion.  To determine likelihood of confusion, the following factors need to be examined: "the strength of the trade dress, the similarity of design, the similarity of the product, the similarity of retail outlets and purchasers, the similarity of advertising media used, the defendant's intent, and actual confusion."  *Vital Pharm.*,

511 F. Supp. 2d at 1314. Here, it is undisputed that Indusparquet affixes its own marks on the boxes and the display racks. It is also undisputed that its mark is different than the BR-111 mark. Thus, there is no confusion or even potential confusion. *See, e.g., Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 269 F.3d 114, 122 (2d Cir. 2001) ("Labels can be integral, if not dispositive, factors in determining overall similarity of trade dress."). Accordingly, we conclude that BR-111 has failed to establish the substantial likelihood that it will prevail on its trade dress infringement claim.

With regard to the patent infringement claim, in order to obtain injunctive relief, BR-111 must establish that: "1) it will likely prove infringement; and 2) any challenges to the validity and enforceability of its patent 'lack substantial merit.'" *Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d 1343, 1348 (Fed. Cir. 2003). BR-111 contends that it has a valid and enforceable design patent for its displays. BR-111 claims that Defendants infringed on BR-111's patented displays when Defendants suggested to their dealers that they put the Indusparquet label over BR-111's information and when they began shipping the labels.

"The design patent, unlike the utility patent, limits protection to the ornamental design of the article." *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1295 (Fed. Cir. 2010). "By obtaining a design patent, not a utility patent, [the plaintiff] limited his patent protection to the ornamental design of his article . . . thus it is the non-functional design aspects that are pertinent to determinations of infringement." *Id.*

"If the patented design is primarily functional rather than ornamental, the patent is invalid." *Id*.

The floor standing display rack at issue here is utilized in stores so that consumers can view samples of different types of products being sold, such as tiles carpets or glass. These are purely functional elements of the floor standing display rack. Therefore, BR-111 has not established that Defendants' challenge to the design patent's validity "lacks substantial merit."

Furthermore, the distributors that purchased the displays appear to be protected by the exhaustion doctrine. "Generally, when a seller sells a product without restriction, it in effect promises the purchaser that in exchange for the price paid, it will not interfere with the purchaser's full enjoyment of the product purchased." *Hewlett Packard Co. v. Repeat-O Type Stencil Mfg. Corp., Inc.*, 123 F.3d 1445, 1451 (Fed. Cir. 1997). "The buyer has an implied license under any patents of the seller that dominate the product or any uses of the product to which the parties might reasonably contemplate the product will be put." *Id*.

In *Hewlett*, a company sold disposable ink cartridges and brought an action for trademark infringement against the buyer of the cartridges who modified them to render them refillable, and then resold them. *Id*. at 1454. The court found that there was no infringement because "even though HP clearly intends the filled cartridges which it sells to be discarded after a single use, HP cannot use the patent laws to impose restrictions on the cartridges use after selling them unconditionally." *Id*. The Federal Circuit reasoned that if the court were "to rule in HP's favor in [that] case, [the

court] would be depriving [the defendant] of the right to use and resell its own property, an unused product it purchased free of restriction." *Id.*

In this case, the evidence suggests that BR-111 sold the displays to the retailers free of any restrictions. Therefore, when BR-111 sold the displays, BR-111 essentially relinquished its right to enforce its purported design patent relating to the displays sold to exclude the retailers from using them in any manner they wish, or even selling them.

Thus, similarly to the trade dress infringement claim, BR-111 has failed to establish the substantial likelihood that it will prevail on its trademark infringement claim.

Finally, to recover under the FDUTPA, a plaintiff must prove: 1) a deceptive act or unfair practice; 2) causation; and 3) actual damages. *Smith v. Wm. Wrigley Jr. Co.*, 663 F. Supp. 2d 1336, 1339 (S.D. Fla. 2009) (quoting *City First Mortgage Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. 4th DCA 2008)). A deceptive practice is one that is likely to misled consumers. *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. 1st DCA 2000). Unlawful acts and practices are defined under section 501.204 of the Florida Statutes:

> (1) Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

> (2) It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2006.

Fla. Stat. § 501.204.  An unfair practice, under the federal counterpart of this Act, has been defined as one that "offends established public policy" and one that is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Spiegel, Inc. v. Fed. Trade Comm'n*, 540 F.2d 287, 293 (7th Cir. 1976).

According to Plaintiff's complaint and its motion, BRW's deceptive tactics include: 1) using, and intending to continue using BR-111's product codes; 2) contacting distributors and dealers to inform them that Indusparquet is taking over for BR-111 and that Indusparquet actually is BR-111; 3) attempting to ship product to distributors in BR-111's boxes by merely putting a sticker over BR-111's goods; 4) suggesting to dealers that they simply place the Indusparquet label on BR-111 displays despite the fact the displays are patented; and 5) interfering with BR-111's relationship with Lowes.

However, contrary to the conclusive allegations listed in the complaint, we conclude that a genuine issues of material fact exist as to whether Defendants are utilizing BR-111's product codes and informing distributors that Indusparquet actually is BR-111.  Furthermore, majority of the alleged conduct, even if true, does not amount to immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. *See, e.g., Global Tel\*Link Corp. v. Scott*, 652 F. Supp. 2d 1240, 1249 (M.D. Fla. 2009) (denying preliminary injunctive relief where plaintiff brought an action under FDUTPA to enjoin a competitor from negotiating with a county jail for exclusive rights to provide inmate telephone services contending that defendant negotiated for

an exclusive agreement and advertised to customers that it had an exclusive contract when it knew plaintiff had such an exclusive contract in place).

Moreover, BR-111's FDUTPA claim relating to the utilization of boxes and displays fails because the legal analysis is the same as that employed for its alleged trade dress claim. Mainly, Plaintiff failed to establish substantial likelihood that customers will be misled by Defendants' actions. *See Sharn, Inc. v. Wolfe Tory Medical, Inc.*, No. 8:09-cv-706-T-33AEP, 2009 WL 3416503, at *9 (M.D. Fla. Oct. 19, 2009) (FDUTPA claim "stand and fall with its trade dress infringement claim. Because Wolfe Tory has not demonstrated a substantial likelihood of success on the merits of its trade dress infringement claim, there is not a substantial likelihood of success with respect to its deceptive practices act claim and unfair competition claim.").

Accordingly, because we conclude that BR-111 has failed to establish substantial likelihood of success on any of its claims, we recommend that its motion for preliminary injunction should be denied. Given our determination on BR-111's likelihood of success on the merits, we need not consider the remaining conditions prerequisite to injunctive relief. *1-800 Contacts*, 299 F.3d at 1247.

### 3.  *BRW's Motion for Preliminary Injunction*

In its Verified Emergency Motion for Preliminary Injunction, BRW moves for an injunction requiring BR-111 to: 1) refrain from interfering with BRW's business relationship with BRW's clients; and 2) allow BRW to sell the BRW property in the Indusparquet Boxes by placing permanent labels fully covering the BR-111 trade information. Without indulging into analysis of all necessary prongs for an injunctive

relief, we recommend that the motion should be denied because BRW has clearly failed to establish that it will suffer irreparable harm if such injunction is not granted.

Irreparable harm is the "'*sine qua non* of injunction relief.'"  *Siegel*, 234 F.3d at 1176 (quoting *Northeastern Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)).  Without a finding of a likelihood of an "actual and imminent" irreparable injury, preliminary injunctive relief is improper.  *Id*.  To satisfy this requirement a movant must show a significant threat of irreparable harm, and not merely rely on remote or speculative injuries.  *See, e.g., Ruffin v. Great Dane Trailers*, 969 F.2d 989, 995 (11th Cir. 1992) (injunction is inappropriate if possibility of future harm arising from the behavior plaintiff seeks to enjoin is purely speculative).  To demonstrate irreparable injury, "a movant must show that it will suffer an injury that cannot be adequately compensated if, at some later point in time, it prevails on the merits of the case." *Glen Rayen Mills, Inc. v. Ramada Intern., Inc.*, 852 F. Supp. 1544, 1547 (M.D. Fla. 1994).  The Eleventh Circuit instructs us that:

> Irreparable injury must be neither remote nor speculative, but actual and imminent.  Moreover, if any injury can be undone through monetary remedies, it is not irreparable.  The key word in this consideration is *irreparable*.  Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm . . . . [P]rospective harm, by itself, clearly does not meet the test of imminence.

*SME Racks, Inc. v. Sistemas Mecanicos Para, Electronica, S.A.*, 243 Fed. Appx. 502, 504 (11th Cir. 2007) (emphasis in original) (internal citations and quotation marks

omitted).  The mere possibility that plaintiff may never collect on its judgment does not make out irreparable harm.  *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004).

In support of its argument in favor of finding irreparable harm, BRW claims that it is "about to lose $2,200,000 in sales to Distributors because BRW Floors is being prevented by BR-111 from delivering the BRW Floor Products sold to the Distributors." Clearly, this fact alone falls way short of establishing irreparable harm.  Should it prevail on the merits in this case, BRW will be able to recover all damages that were allegedly caused by BR-111's wrongful conversion of its product.

BRW also claims that injunction is warranted in order "to enjoin BR-111 from destroying BRW Floors sales, profits, relationships with its customers, reputation, goodwill, and its entire business."  These conclusory allegations, however, also fail to establish irreparable harm.

As Defendants/Counter-Plaintiffs themselves concede, for approximately 20 years, Indusparquet and Floor Company were merely manufacturers of products that were distributed in the United States under BR-111's trademark.  *See* Verified Counter-Claim and Third-Party Complaint ¶¶ 14-15 [D.E. 11].  It was not until May 2010, that the distributors allegedly directly contacted Defendants and sought to purchase the products directly from Defendants.  *Id*.  ¶¶ 31-33.  Before this time, however, Defendants never participated in the North American tile wood market as direct suppliers.  In other words, any of Defendants' goodwill, reputation or customer

base as direct distributors would have to been created in a span of few weeks.  Based on the record before us, we can not make such a finding.

Loss of goodwill or customer base is different from a potential inability to create such intangible assets due to actions of another.  The latter is present here.  BR-111's actions of allegedly wrongfully withholding of the product at its facilities only prevents BRW from entering and growing in the American market.  These actions do not, however, destroy Defendant's goodwill, relationships with its customers, or reputation.

Accordingly, we find that Defendants have not demonstrated that they will suffer irreparable harm if an injunctive relief that they seek is not entered.  Should Defendants prevail on the merits in this case, legal remedies will amply compensate them for any damages they may have suffered as a result of Plaintiff's actions.  We therefore recommend that Defendants' motion for preliminary injunction be denied.

**B.**     **_BRW's Motion for Issuance of Prejudgment Writ of Replevin_**

Section 78.01 of the Florida Statutes provides two alternative procedures for obtaining a writ of replevin under Florida law prior to entry of a final judgment awarding possession.  Pursuant to sections 78.065 and 78.067, and in the absence of an effective waiver, the defendant must be given notice and a show cause hearing must be held before the writ of replevin may be issued.  *Brown v. Reynolds*, 872 So. 2d 290, 294 (Fla. 2d DCA 2004).   Pursuant to section 78.068, on the other hand, the prejudgment writ may be issued without notice and a hearing, but the plaintiff must post a bond.  *Id.* (citing *Prestige Rent-A-Car, Inc. v. Advantage Car Rental & Sales, Inc. (ACRS)*, 656 So. 2d 541, 545 (Fla. 5th DCA 1995)).

In its motion, BRW cites to the ex parte procedure outlined in section 78.068. BR-111, however, points out that it has notice and a hearing on this motion already took place. As a result, BR-111 agues that the Court should properly evaluate BRW's motion under sections 78.065 and 78.067.  We agree.[1]

Under section 78.067, the Court has to "make a determination of which party, with reasonable probability, is entitled to the possession of the claimed property pending final adjudication of the claims of the parties."  Fla. Stat. § 78.067(2).  As the statute further explains, "[t]his determination shall be based on a finding as to the probable validity of the underlying claim alleged against the defendant."  *Id.*; *see, e.g., Morse Operations, Inc. v. Superior Rent-A-Car, Inc.*, 593 So. 2d 1079, 1081 (Fla. 5th DCA 1992) (court held that car owner established with reasonable probability that it was entitled to possession of the cars because the rental car company was in default on its payments); *Waite Aircraft Corp. v. Ford Motor Credit Co.*, 430 So. 2d 1003, 1004 (Fla. 4th DCA 1983) (credit company was issued prejudgment writ of replevin where credit company established its right to issuance of the writ because aircraft corporation failed to make payments as agreed under the lease).  As more fully explained below, the Court finds that BRW is not entitled to the prejudgment writ of replevin because it has not established the probable validity of its claims.

BRW did not establish with reasonable probability that it has an immediate possessory interest to the materials currently stored at BR-111's warehouse.  For example, BRW admits that "[t]he boxes and packaging are owned by Indusparquet and

---

[1]    It is important to note that BRW never filed a reply challenging BR-111's assertion about the applicability of sections 78.065 and 78.067.

Floor Company, as well as the Products until such time as they were sold and delivered to BR-111." *See* Counter-Plaintiffs' Motion for Replevin ¶ 5. In other words, the products were developed by BR-111 and then produced by Indusparquet and Floor Company to BR-111's design and specifications. These products were then packaged in Brazil by Indusparquet and Floor Company in boxes imprinted with BR-111 trademarks and installation instructions and shipped to BR-111's storage facilities in the United States. Such has been the oral business arrangement between the parties for many years. No written contract existed.

The Uniform Commercial Code provides that:

(1) . . . title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading.

(a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require the seller to deliver them at destination, title passes to the buyer at the time and place of shipment; but

(b) if the contract requires delivery at destination, title passes on tender there.

Fla. Stat. § 672.401. Thus, under the clear language of this statute, title to the product in dispute here passed to BR-111 upon the delivery of the product to BR-111. *See, e.g., Palm Beach Auto Brokers, Inc. v. DeCarlo*, 620 So. 2d 250, 252 (4th DCA 1993) (finding that used car dealer's failure to timely transfer to purchaser title to automobile did not

indicate that the dealer did not intend sale of automobile; provision of UCC that, unless otherwise explicitly agreed, title passes to buyer at time and place at which seller completes his performance with reference to physical delivery of goods governed transaction so that title passed upon physical delivery of automobile from dealer to purchaser).

Here, BR-111 argues that under the oral contract, the parties' course of dealing, course of performance and the U.C.C., it took title when the product was physically delivered to BR-111. Plaintiff's argument, if proven at trial, has merit. As result, a strong defense is in the record that possession to the product located at BR-111's warehouse does not lie with BRW.

For example, in *Future Tech Int'l v. Tae IL Media Ltd.*, a buyer/distributor of computer equipment brought suit against Korean manufacturer alleging various causes of action based on conduct of defendants allegedly aimed to usurp plaintiff's Latin American distribution network. 944 F. Supp. 1538, 1542 (S.D. Fla. 1996). Manufacturer counterclaimed and filed a motion for pre-judgment replevin to recover certain computer equipment that it claimed it was entitled to possess. *Id.* at 1544. The court denied the motion after concluding that the "'delivery' to Future Tech occurred not in Miami, but in Pusan [Korea], where title and the risk of loss passed to Future Tech. *Id.* at 1549. Judge Marcus further emphasized that "although the goods were - and continue[d] to be - in the possession of Future Tech's shipper, Future Tech has had lawful title to the equipment since delivery at Pusan." *Id.* We believe that

similar reasoning applies here.  Although BR-111 may very well have not paid for the product, the record indicates that it took title to the product at the time of delivery.

Based on the record before us, we are unable to make a finding that there is a "reasonable probability" that BRW is entitled to possession of the product located at BR-111's warehouse in Medley, Florida.  Even assuming that BR-111 "has not paid the balance of the outstanding invoices, these facts, standing alone, do not confer on [BRW] an immediate right to possess the [product]." *Id.* at 1551.  The statutory showing required under chapter 78 of the Florida Statutes has not been made.  Accordingly, the prejudgment remedy of replevin is unwarranted and BRW's motion should be denied.[2]

## III.  CONCLUSION AND RECOMMENDATION

For the foregoing reasons, it is hereby **RECOMMENDED** as follows:

1.      Plaintiff BR-111's Verified Emergency Motion for a Temporary Restraining Order and Preliminary Injunction [D.E. 5] should be **DENIED**.

2.      Defendant/Counter Plaintiff BRW's Verified Emergency Motion for Preliminary Injunction [D.E. 21] should be **DENIED**.

3.      Defendant/Counter Plaintiff BRW's Verified Emergency Motion for Issuance of Prejudgment Writ of Replevin [D.E. 10] should be **DENIED**.

4.      Defendant/Counter Plaintiff BRW's Verified Emergency Motion for Temporary Restraining Order Enjoining the Sale or Other Dissipation of the Property at Issue in BRW's Motion for Prejudgment Writ of Replevin [D.E. 58] should be **DENIED**.

---

[2]      For the same reasons stated herein we also recommend the denial of BRW's Verified Emergency Motion for Temporary Restraining Order [D.E. 58]

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Donald L. Graham, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND ORDERED** in Chambers at Miami, Florida, this 23d day of September, 2010.

                /s/ *Edwin G. Torres*
                EDWIN G. TORRES
                United States Magistrate Judge